# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-10-00506-CV

Harper Park Two, LP, Appellant

v.

City of Austin, Texas; Greg Guernsey, Solely in his Capacity as Director of the Watershed Development Protection and Development and Review Department of the City of Austin, Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-09-003295, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## O P I N I O N

Under chapter 245 of the local government code, once an application for the first permit required to complete a property-development "project" is filed with the municipality or other agency that regulates such use of the property, the agency's regulations applicable to the "project" are effectively "frozen" in their then-current state and the agency is prohibited from enforcing subsequent regulatory changes to further restrict the property's use. *See* Tex. Loc. Gov't Code Ann. §§ 245.001-.007 (West 2005); *Shumaker Enters., Inc. v. City of Austin*, 325 S.W.3d 812, 814-15 & n.5 (Tex App.—Austin 2010, no pet.). However, these vested-rights protections are, in effect, lost or forfeited to the extent that the development being pursued constitutes a new or different "project" from the one for which the initial permit was sought. *See City of San Antonio v. En Seguido, Ltd.*, 227 S.W.3d 237, 242-43 (Tex. App.—San Antonio 2007, no pet.). This appeal presents questions concerning how one identifies the relevant "project" to which vested rights attach

under chapter 245. We address these questions in the context of a dispute between a property owner, appellant Harper Park Two, and the City of Austin (City), appellee, over whether the identification of a single lot as "office" use in an application for a preliminary plan for a larger mixed-use commercial development project—a label that the parties agree would not have bound the owner to "office" use at the time—established that the relevant "project" with respect to that individual lot was limited to construction of an office building and did not extend to construction of a hotel. The district court rendered judgment declaring that chapter 245's vested-rights protections would apply only to development of the lot for office use and that any other type of commercial development must comply with the City's current—and more restrictive—land-use regulations. We disagree, and will reverse.

## BACKGROUND

**Regulatory backdrop**

As a general rule, "the right to develop property is subject to intervening regulations or regulatory changes." *Quick v. City of Austin*, 7 S.W.3d 109, 128 (Tex. 1999) (op. on reh'g). However, "the Texas Legislature [has] significantly altered this rule by requiring that each permit in a series required for a development project be subject to only the regulations in effect at the time of the application for the project's first permit, and not any intervening regulations." *Id.* At times relevant to this appeal, chapter 245 of the local government code has provided:

> (a)   Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the permit is filed.

2

(b)      If a series of permits is required for a project, the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. All permits required for the project are considered to be a single series of permits. Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats are considered collectively to be one series of permits for a project.

*See* Act of May 11, 1999, 76th Leg., R.S., ch. 73, § 2, 1999 Tex. Gen. Laws 432, *codified as amended*, Tex. Loc. Gov't Code Ann. § 245.002(a)-(b).[1] The effect of these requirements, as previously noted, is to "freeze" most of the regulatory authority's land-use regulations as they existed at the time the first permit application is filed through completion of the "project." *See Shumaker Enters., Inc.*, 325 S.W.3d at 814-15 & n.5.[2] On the other hand, if there are subsequent regulatory changes that "enhance or protect the project," chapter 245 entitles a permit holder to "take

---

[1] Amendments in 2005 added language elaborating that vested rights are triggered by the filing of a permit application "for review for any purpose, including review for administrative completeness" or a "plan for development of real property or plat application" that "gives the regulatory agency fair notice of the project and the nature of the permit sought," and further providing that an application or plan is considered filed on the date sent by certified mail. *See* Act of Sept. 1, 2005, 79th Leg., R.S., ch. 6, § 2, 2005 Tex. Gen. Laws 5-6, *codified at* Tex. Loc. Gov't Code Ann. § 245.002(a), (a-1) (West 2005). Both parties cite the current version of the statute and neither party suggests on appeal that the 2005 amendments would have any substantive impact on our analysis. On the other hand, in the district court, the City, responding to Harper Park Two's arguments that the initial permit application gave the City "fair notice" of a "project" that could include a hotel, emphasized that "the fair notice provision didn't apply until 2005," suggesting a view that the amendment, if anything, would have inured to Harper Park Two's benefit. However, the amended language, strictly speaking, is not before us. *See id.* § 245.002(g) (West 2005) (specifying that 2005 amendments to section 245.002, subsection (a), and addition of subsection (a-1) "apply only to a project commenced on or after the effective date" of those amendments).

[2] Certain types of regulations, none of which are at issue here, are exempted from chapter 245's limitations. *See id.* § 245.004 (West 2005).

advantage" of the changes "without forfeiting any rights under this chapter." Tex. Loc. Gov't Code Ann. § 245.002(d). These vested rights, furthermore, attach to the "project," not to a particular property owner or permit holder and, as such, "follow" any conveyances or transfers of rights related to the project. *See En Seguido, Ltd.*, 227 S.W.3d at 242-43 (citing Op. Tex. Att'y Gen. No. JC-0425 (2001)) (explaining that rights vest in a project, and are not affected by transfer of ownership). But the applicability of these protections, again, assumes that the same "project" is being pursued. *See id.*[3]

The obvious intent of chapter 245 is to prohibit land-use regulators from changing the rules governing development projects "in the middle of the game," thereby insulating already-underway development and related investment from the vicissitudes and uncertainties of regulatory decision making and all that may influence it. That intent is further confirmed by the Legislature's explicit findings regarding chapter 245's purpose: to combat "administrative and legislative practices that often result in unnecessary governmental regulatory uncertainty that inhibits the economic development of the state[,] increases the costs of housing and other forms of land development[,] and often resulted in the repeal of previously issued permits causing decreased property and related values, bankruptcies, and failed projects." *See* Act of May 11, 1999, 76th Leg., R.S., ch. 73, § 1(b), 1999 Tex. Gen. Laws 432; *see also Quick*, 7 S.W.3d at 128 (purpose of chapter 245's statutory predecessor, former chapter 481 of the government code, was to "establish requirements relating to the processing and issuance of permits and approvals by governmental regulatory agencies in order to alleviate bureaucratic obstacles to economic development").

---

[3] Vested rights attaching to a "project" may also be lost if a "project" is deemed "dormant." *See id.* § 245.005 (West 2005). That provision is not at issue here.

4

Moreover, as an incidental matter of historical fact, the legislative record reflects that bill proponents advocated chapter 245 as an appropriate response to instances when the City of Austin had purportedly imposed new regulatory restrictions retroactively on development projects that were already underway, causing project failures, bankruptcies, and regulatory uncertainty for developers and landowners.[4]

**The initial permit application**

On July 30, 1985, the predecessor-in-title to Harper Park Two filed with the City an application for a preliminary plan—an initial step in platting a subdivision—for a subdivision of roughly 98 acres to be known as Harper Park. The property is located along U.S. Highway 290, and is situated to the west of what were then the City's municipal boundaries. However, because the property came within the City's extraterritorial jurisdiction, it was subject to the City's limited authority to regulate platting and subdivision of land,[5] in particular a pair of City ordinances governing subdivisions built in the Barton Creek Watershed, the area where Harper Park would be located. Simply described, these ordinances (the "Barton Creek Watershed ordinances") imposed certain limitations on the location and density[6] of two categories of "development"[7] over the

---

[4] *See* House Research Organization, Bill Analysis, Tex. H.B. 1704, 3-4, 76th Leg., R.S. (2005).

[5] *See* Tex. Loc. Gov't Code Ann. § 212.002 (West 2008).

[6] Including impervious cover restrictions.

[7] Defined as including "buildings and other structures; construction; and excavation, dredging, grading, filling, and clearing or removing vegetation." Austin, Tex., City Code ch. 41A, art. I, § 41A-101.4(b) (1981); Austin, Tex., City Code ch. 9-10, art. V, § 9-10-305(b) (1982).

watershed: (1) single and two-family residential housing units, and (2) "commercial" development, which included "all development other than one or two-family residential housing structures." Austin, Tex., City Code ch. 41A, art. I, § 41A-101.4(b) (1981); Austin, Tex., City Code ch. 9-10, art. V, § 9-10-305(b) (1982).

The preliminary plan application proposed that Harper Park would be a mixed-use development of "Condo, Office, Commercial," and illustrated a configuration of thirteen lots with roads and other infrastructure. There were no metes and bounds descriptions. Each of the lots illustrated on the plan was labeled with a use that included "retail," "multi-family," "athletic club," and "office." One of these lots, approximately six acres in size and labeled "office," is at the center of the present dispute.

There is no dispute that the labels on the preliminary plan application were not mandatory and were not binding on the property owner at the time. Under the City's applicable land-use regulations at the time, which consisted solely of the Barton Creek Watershed ordinances, the labels merely identified "commercial" development that would be subject to the ordinances' corresponding location and density limitations. As the City concedes, it had no further power to control use of the land, as its zoning authority did not extend beyond its municipal boundaries. For example—and significantly for this case—the City acknowledges that as long as the watershed ordinances were complied with, it could not have prevented construction of a hotel on the six-acre lot instead of an office building.

There is likewise no dispute that the filing of the Harper Park preliminary plan application, from the standpoint of these proceedings, invoked the vested-rights protections

6

of local government code chapter 245 with respect to the "project."[8]  Consequently, the City was required to apply only its "orders, regulations, ordinances, rules . . . or other properly adopted requirements" that were in effect at the time the Harper Park preliminary plan application was filed—i.e., only the Barton Creek Watershed ordinances—as "the sole basis for consideration of all subsequent permits required for the completion of the project."  Act of May 11, 1999, 76th Leg., R.S., ch. 73, § 2, 1999 Tex. Gen. Laws 432; *see* Tex. Loc. Gov't Code Ann. § 245.002(a), (b).

**Subsequent events**

The City approved the Harper Park preliminary plan in November 1985.  Later that same year, the City annexed the subdivision, thereby gaining zoning authority over it.  The owner requested zoning in 1986.  As conditions of the requested zoning, the City insisted that the owner agree to restrictive covenants imposing height limits and building-material restrictions, as well as dedicate streets to public use.  Due to financial difficulties encountered by the original owner, the zoning was ultimately not approved until 1992.[9]  The zoning ordinance identified the lots by metes

---

[8] *See* Tex. Loc. Gov't Code Ann. §§ 245.001(1) (defining "permit" as "a license, certificate, approval, registration, consent, permit, . . . or other form of authorization required by law, rule, regulation, order, or ordinance that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought"), (4) ("regulatory agency" is "the governing body of, or a bureau, department, division, board, commission, or other agency of, a political subdivision acting in its capacity of processing, approving, or issuing a permit"), .003 (chapter applies to "project" in which a "permit" application had been filed or a permit issued before September 1, 1997, and was still in progress as of that date) (West 2005).

[9] The Austin City Council adopted first-reading zoning ordinance approval for the property in 1986.  However, the owner, who had taken bankruptcy in late 1980, could not execute the restrictive covenants and street deeds on which the City had conditioned its zoning approval.  As a result, it was not until 1992, when a subsequent owner—a bank—executed the covenants, that the ordinance received its third and final reading, at which point the zoning requested in 1986 was approved by adoption of zoning ordinance 920123-E.

and bounds descriptions and zoned some lots "General Office," some "Limited Office," some "Community Commercial," and others "Multifamily Residence" and "Townhouse and Condominium Residence." The six-acre lot at issue was zoned "GR-CO"—"Community Commercial," with a conditional overlay. While this zoning permitted construction of an office building on the lot, it did not limit the lot's use to an office, either, and it is undisputed that permissible commercial uses under this zoning included building a hotel.

In the mid-1990s, the then-owner of the Harper Park subdivision submitted a revised preliminary plan that proposed to use a large portion of the property as a private school campus. Other portions of the preliminary plan—including the six-acre lot labeled "office"—were unchanged. Ultimately, the owner filed and obtained approval for a final plat for "Harper Park Section One," which encompassed 74 of the 98 acres of the original property. On this portion of the original preliminary plan had been nine lots with indicated uses that included retail, two lots labeled "office," a lot labeled "athletic club," and two lots labeled "multi-family." The final plat replaced this lot configuration (and the only lots in the entire development that had been labeled "retail" or "multi-family") with two larger lots used solely as a private school campus—that of the St. Andrews Episcopal "upper school"—and eliminated several roads.

By the time of these filings and approvals, the statutory predecessor to chapter 245 had taken effect. In connection with the filings, the owner requested a determination from the City (termed an "HB 1704" determination, after the statute's bill number) as to whether the proposed changes were within the scope of the Harper Park "project" so as to retain vested-rights protections and be subject to review under the City's land-use regulations in effect when the original preliminary

8

plan application was filed, June 30, 1985. The City issued a determination that the property would remain protected.

**The present dispute**

Four lots, including the six-acre tract at issue here, were not part of Harper Park Section One; they remained an unfinished part of the project. In 2007, appellant Harper Park Two applied for a final plat of the six-acre lot, which it called "Harper Park Section Two." The application described the use of the property as "Commercial-Retail." Harper Park Two also requested a vested-rights determination that its final plat application would, pursuant to chapter 245, be reviewed under the City's land-use regulations in effect on July 30, 1985. The City rejected the application, asserting that the label "office" on this area of the 1985 preliminary plan precluded retail uses. In order to get the final plat approved while maintaining the right to develop the property under the 1985 regulations, Harper Park Two revised its application to eliminate the reference to "retail" use, instead specifying "Commercial-Office." As both parties acknowledge, the terms "Commercial-Retail" and "Commercial-Office" do not appear anywhere in the City Code and are merely shorthand descriptions of intended land uses. Harper Park Two also emphasizes that the label "office" was not included on the final plat, and that plat note 14 specifies that the property shall be developed in accordance with the Barton Creek Watershed ordinances—which, as previously noted, define commercial development to include all development other than one- and two-family homes—"or such other water quality ordinance as may be agreed upon between the owner and the City at time of site plan approval." *See* Austin, Tex., City Code ch. 41A, art. I, § 41A-101.4(b)

9

(1981); Austin, Tex., City Code ch. 9-10, art. V, § 9-10-305(b) (1982). The City approved the final plat for Section Two in December 2007.

In October 2009, Harper Park Two submitted a site plan application to build a hotel on Section Two. Harper Park Two sought to have the site plan reviewed under the regulations in effect as of June 30, 1985. However, the City asserted that a hotel was a different "project" from the one initiated by the 1985 preliminary plan application and that only an office could be developed on Section Two under the 1985 regulations. If Harper Park Two desired to construct a hotel on the lot, the City maintained, the development would have to comply with the City's current land-use regulations, which are more restrictive than those in effect in 1985.[10]

Harper Park Two sued the City and its Director of Planning and Development Review Department, in his official capacity, seeking a declaratory judgment that it "is entitled to develop [Section Two] as a hotel or any other commercial or office use" consistent with the rules, regulations, ordinances, and requirements in effect on July 30, 1985.[11] It also sought attorney's fees as permitted by the Uniform Declaratory Judgments Act.[12] Following a bench trial, the district court rendered judgment declaring "that Plaintiff's proposed hotel project is a change in project under Chapter 245 . . . and, therefore, is not entitled to be developed pursuant to the regulations in effect

---

[10] Harper Park insists that imposition of the current regulations—particularly, the current impervious cover limitations—would effectively preclude any commercial development of the six-acre lot, given the relatively small dimensions of the property.

[11] Chapter 245 waives a political subdivision's governmental immunity from suit to the extent of a suit for declaratory, injunctive, or mandamus relief to enforce the statute's protections. *See* Tex. Loc. Gov't Code Ann. § 245.006 (West 2005).

[12] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008).

10

on July 30, 1985," and "that Plaintiff is not entitled to develop its property as a hotel, or for any commercial development, pursuant to the rules, regulations, ordinances, and requirements in effect on July 30, 1985, save and except for office." The court further rendered judgment that Harper Park Two take nothing on its claims. It subsequently entered findings of fact and conclusions of law. The findings included, "[t]he project on July 30, 1985, was an office," and "[a] hotel is not the same project as an office."

Following trial, Harper Park Two moved for new trial or to reopen the evidence based on the allegation that it had since uncovered a City document that had been responsive to its discovery requests but that the City had failed to produce. The document was a 1995 memorandum from the City's then-director of planning and development, titled "SB 1704 Guidelines," consisting of instructions to City staff concerning their implementation of chapter 245's statutory predecessor. The SB 1704 Guidelines directed staff that, with respect to development projects initiated in the City's extraterritorial jurisdiction, a "new project" would be presumed if there had been a change between two "major use categories." Those two "major use categories" were—consistent with the basic regulatory structure of the Barton Creek Watershed ordinances—(1) "Single family/duplex"; (2) "All others." Following a hearing, the district court denied the motion. This appeal followed.

## DISCUSSION

Harper Park Two brings two issues on appeal. In its first issue, Harper Park Two challenges the legal and factual sufficiency of the evidence supporting the district court's legal conclusion that the relevant "project" on the date the initial preliminary plan application was filed (July 30, 1985) was solely an office, such that the vested-rights protections of chapter 245 would

11

extend only to that sort of development and not to the desired hotel building. In its second issue, Harper Park Two urges in the alternative that the district court abused its discretion in refusing to reopen the evidence or grant a new trial in light of the late-discovered 1995 "SB 1704 Guidelines" memorandum. We need only address the first issue.

Although couched as an evidentiary-sufficiency complaint, Harper Park's first issue turns principally on construction of chapter 245 of the local government code and its application to undisputed material facts. Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Consequently, we do not defer to any construction of chapter 245 by the district court that is reflected in its findings or conclusions. *See In re E.I. DuPont de Nemours & Co.*, 92 S.W.3d 517, 522 (Tex. 2002) (proper construction of a statute "is a legal issue on which the trial courts' views are not entitled to deference"); *Hartsell v. Town of Talty*, 130 S.W.3d 325, 327 (Tex. App.—Dallas 2004, pet. denied) ("Because construction of Chapter 245 is a question of law, we do not defer to the trial court's findings.").

Our primary objective in statutory construction is to give effect to the Legislature's intent. *See Shumake*, 199 S.W.3d at 284. We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437;

12

*City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws on the same or similar subjects," and "consequences of a particular construction." *Id.* § 311.023(1)-(5) (West 2005). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

The parties' dispute centers on the meaning of "project" as used in chapter 245. Chapter 245 defines "project" as "an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." Tex. Loc. Gov't Code Ann. § 245.001(3). The "endeavor" that characterizes a "project," the parties agree, would necessarily be reflected in the contents of the initial permit application, here the

13

1985 preliminary plan application. However, the parties differ, as a threshold matter, as to whether we are to look to the entirety of the endeavor contemplated in the application or solely to the portion of the plan relating specifically to the six-acre lot at issue. Harper Park Two urges the former interpretation, while the City, insisting that the preliminary plan application identified multiple, separate "projects" applicable to individual lots, asserts the latter view. Only Harper Park Two's construction finds support in the statutory text.

The Legislature defined "project" in chapter 245 in terms of a single "endeavor" that may require a "series" of permits to complete. *Id.*; *see id.* § 245.002(b). It further provided that "[a]ll permits required for the project," including "[p]reliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats[,] are considered collectively to be one series of permits for a project." *Id.* It is the filing of "the original application for the first permit in that series," furthermore, that triggers the vested rights under the statute. *Id.* From these interrelated provisions, it is evident that the relevant "project" is, as Harper Park Two contends, the single "endeavor" reflected in the "original application for the first permit in th[e] series"—not, as the City suggests, individual components of the larger, original "project"/"endeavor" that may subsequently require separate permits. *See Hartsell*, 130 S.W.3d at 328 (rejecting Town's argument that subdivision "project" should be divided into an infrastructure planning project and a home-construction project, and noting that "the definition of 'project' contemplates 'one or more permits' may be 'required to initiate, continue, or complete the endeavor'"); *see also BMTP Holdings, L.P. v. City of Lorena*, 2011 Tex. App. LEXIS 4207 at *14 (Tex. App.—Waco June 1, 2011, no pet. h.) (op. on reh'g; mem. op.) ("[c]hapter 245 has been held to encompass the entire development process from the preliminary plat to the

14

construction of a structure within the subdivision, which does not change unless the scope of the 'project' changes, regardless of changes in ownership" and "the project includes the entire process, not the discrete components"); *see also DeQueen*, 325 S.W.3d at 635 (we presume that the Legislature selected statutory language deliberately and purposefully); *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998) ("legislative intent should be determined from the entire act, and not simply from isolated portions" so "we must read the statute as a whole and interpret it to give effect to every part"). Consequently, the relevant "project" under chapter 245 is the Harper Park subdivision as a whole, as reflected in the 1985 preliminary plan application, not the six-acre lot viewed in isolation.

Relatedly, Harper Park Two urges that the "office" label on the six-acre lot in the 1985 preliminary plan application does not, as a matter of law, limit the nature of the relevant "project" solely to an office building. What mattered instead, Harper Park Two asserts, was the application's characterization of the overall development as mixed-use "Condo, Office, Commercial." It also emphasizes that under the City's land-use regulations applicable at the time—the Barton Creek Watershed ordinances—offices, hotels, and other forms of development other than single and two-family residential units all came within a single regulatory classification of "commercial" development. *See* Austin, Tex., City Code ch. 41A, art. I, § 41A-101.4(b) (1981); Austin, Tex., City Code ch. 9-10, art. V, § 9-10-305(b) (1982). Assuming the "commercial" development was constructed in a manner consistent with the requirements of the Barton Creek Watershed ordinances, as Harper Park Two observes, the City had no authority at the time to control whether the development was an office, a hotel, or some other type of commercial development. The City, in fact, acknowledges that the use labels on the preliminary plan application were not

15

mandatory or binding and that it had no authority on June 30, 1985, to prevent construction of a hotel rather than an office on the six-acre lot.

We agree with Harper Park that the "project" identified in the 1985 preliminary plan application was—with respect to both the six-acre lot and the entire property—"commercial" development, as defined under the then-applicable Barton Creek Watershed ordinances, and was not limited to an office building or any other specific type of "commercial" development. To hold otherwise would amount to retroactive imposition of limitations and distinctions that did not exist in the City's "orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect" on June 30, 1985, the date when "the original application for the first permit in th[e] series" of permits required for the project was filed. Tex. Loc. Gov't Code Ann. § 245.002(b). Such retroactive "changing of the rules" governing a development project squarely violates chapter 245. *See id.* In other words, what matters under chapter 245, as Harper Park Two suggests, is that the 1985 preliminary plan application, viewed in the context of the applicable land-use regulations at the time, gave notice to the City that the Harper Park Two subdivision would be a mixed-use "commercial" development subject to the corresponding requirements of the Barton Creek Watershed ordinances. It is this identification of the contemplated development as "commercial" in nature that defines the nature and scope of the "project," not narrower descriptive terms or labels that all parties agree had no legal effect at the time.

In advocating a different conclusion, the City insists that determination of the nature or scope of the relevant "project" turns instead on a fact-intensive assessment of the owner or developer's subjective intent or state of mind at the project's outset and whether the specific development later attempted was specifically contemplated at the project's inception. It suggests

16

that the first-hand testimony of the original owner or developer would be the best evidence of that intent, but barring that, a fact-finder could glean indicia of intent from permit applications and other filings. Under this analysis, the City insists that the "office" labels over the six-acre lot in the 1985 preliminary plan application and 1997 revised plan that preceded the Harper Park One plat can be considered evidence of specific intent to develop the lot solely as an office building and nothing else. As an additional layer of the analysis, the City further reasons that ascertainment of the owner or developer's subjective intent might well turn on the individualized perceptions of whichever City staffers examined the filings (a view that the City offers in downplaying the significance of the 1995 SB 1704 Guidelines memo and its 1997 determination that a private school was part of the original "project" even while a hotel was not in 2009). But the Legislature followed a different approach in chapter 245, looking instead to objectively ascertainable standards—the legal implications of the initial permit filing under the "orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements" in effect at the time. Tex. Loc. Gov't Code Ann. § 245.002(b). We would further observe that the City's approach strikes at the heart of a statute that, as previously noted, is intended to combat regulatory uncertainty.

Beyond this, the City insists that "project" under chapter 245 must be construed "narrowly," and a "narrow" construction, it urges, compels the conclusion that a "project" that includes an office building is not the same as one that includes a hotel. In support, it cites *En Seguido, Ltd.*, 227 S.W.3d at 242-43, and an attorney general opinion cited therein Op. Tex. Att'y Gen. No. JC-0425, for the proposition that "a project is specific" and has "a narrow meaning." The basis for the City's assertion is the *En Seguido* court's recognition that "rights vest in a particular project and are no longer vested if the project changes." *Id.* at 242-43. However, nothing in this

17

statement, especially when read in context with *En Seguido* as a whole, embraces or implies that the relevant "project" must be viewed narrowly.

The question in *En Seguido* was whether En Seguido, the landowner, could subdivide a 27-acre, single-lot tract it had purchased into 154 lots and still maintain vested rights in the "project" for which the initial owner had filed a subdivision plat in 1971. *Id.* at 239-40. In addition to supplanting a single lot with a great many more, the changes entailed adding a considerable number of roads and other infrastructure. The trial court nonetheless granted summary judgment in favor of En Seguido, declaring that the regulations dating back to 1971 would control development of the 154-lot subdivision. *Id.* at 239. The court of appeals reversed the summary judgment on the basis that "genuine issues of material fact were raised with regard to the nature of En Seguido's vested rights." *Id.* at 245. However, as Harper Park Two observes, the court's disposition indicates that on a different summary-judgment record, the 154-lot subdivision might have been considered the same project as the original single-lot development, notwithstanding the dramatic changes. Nothing in this analysis adopts a "narrow meaning" of "project." At most, *En Seguido* merely restates the basic proposition that whatever a "project" was at its inception is entitled to chapter 245 protection. The same is true of the attorney general opinion. *See* Op. Tex. Att'y Gen. No. JC-0425 at 3.

In any event, we are to construe chapter 245 in a manner consistent with the Legislature's intent, and whether that leads to a particularly "narrow" or "broad" application is entirely a function of the words the Legislature has chosen. *See DeQueen*, 325 S.W.3d at 635 ("We presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind."); *see also City of Waco v. Texas Comm'n on Envtl. Quality*,

18

No. 03-09-00005-CV2011, Tex. App. LEXIS 4644, at *62 (Tex. App.—Austin June 17, 2011, no pet. h.) (op. on reh'g) (noting that statute's text, not perceived subjective intent of Legislature, controlled whether it operated "narrowly" or "broadly"). The words that the Legislature has chosen in chapter 245 guide us to view the relevant project in the context of the applicable land-use regulations in effect at the time the initial permit application was filed. In this case, that analysis leads us to conclude that the "project" was "commercial" development that would encompass a hotel. To the extent that anything in *En Seguido*'s analysis or that of the Attorney General could be seen as inconsistent with that view, we would respectfully disagree with them.

Finally, both parties emphasize events subsequent to the filing of the 1985 preliminary plan application. Harper Park Two emphasizes the 1992 zoning of the six-acre lot as Community-Commercial—a classification that, again, would allow a hotel—suggesting that it was entitled to "take advantage" of the zoning "without forfeiting any rights under this chapter." Tex. Loc. Gov't Code Ann. § 245.002(d). Because we have already held that the original 1985 "project" was "commercial" development that would encompass a hotel, we need not reach whether the 1986 zoning would have independently conferred those development rights if the filing of the preliminary plan application had not. However, we note that because the then-owner voluntarily accepted the 1992 zoning and related restrictive covenants, those limitations, along with the Barton Creek Watershed ordinances, will govern development of the six-acre lot, as Harper Park Two acknowledges.

In addition to citing various perceived indicia of the owner or developer's subjective intent to build only an office on the six-acre lot (an approach that, again, misses the point of chapter 245), the City suggests that Harper Park Two would have waived any vested rights in regard

19

to the lot by applying for a final plat that designated the lot's use as "Commercial-Office." The district court did not make findings to support the City's waiver theory; consequently, it was not preserved. *See Fielder v. Abel*, 680 S.W.2d 655, 656-57 (Tex. App.—Austin 1984, no writ). In any event, we agree with Harper Park Two that its actions in connection with obtaining the final plat fall short of the sort of intentional relinquishment of a known right that characterizes waiver. *See In re General Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) ("Waiver requires intent, either the 'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" (citation omitted)). In applying for the final plat in March 2007, Harper Park Two specified its designated land use as "Commercial-Retail." When the City rejected its application, Harper Park Two changed its description of the intended land use to "Commercial-Office." Neither "Commercial-Retail" nor "Commercial-Office" appears in the City Code, and they are mere shorthand descriptions of land use; neither term in itself had the legal effect of either prohibiting or permitting construction of a hotel. Moreover, Harper Park Two noted on the application to determine chapter 245 protection: "[f]inal plat consistent with approved preliminary." Further, in the letter accompanying its final plat application, Harper Park Two specified that it was not identifying "any particular use" at that time, but instead intended to "final plat and build the associated road which is consistent with the approved preliminary" and noted that the property was zoned "GR"—Community Commercial, again a classification that would permit construction of a hotel. These actions by Harper Park Two are not evidence that it acted inconsistently with asserting its right to build a hotel on the six-acre lot under the land-use regulations in effect in 1985.

In sum, based on our construction of chapter 245 and the undisputed facts that are material to its application here, Harper Park Two's proposed hotel development is within the same

"project" that was initiated by the 1985 filing of the preliminary plan application—"commercial" development, as defined under the Barton Creek Watershed ordinances. Consequently, chapter 245 requires the City to apply the same "orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect" on July 30, 1985, "the time the original application for the first permit . . . [was] filed . . . [as] the sole basis for consideration of all subsequent permits required for the completion of the project," along with the zoning and restrictive covenants that were voluntarily imposed on the property between 1986 and 1992. Tex. Loc. Gov't Code Ann. § 245.002(b). The district court erred in declaring otherwise. We sustain Harper Park Two's first issue, reverse the district court's judgment, and render judgment declaring that Harper Park Two is entitled to develop Section Two as a hotel, office, or any other commercial use consistent with the rules, regulations, ordinances, and requirements in effect on July 30, 1985, and the aforementioned zoning and restrictive covenants.

In the event we so held, Harper Park Two has requested that we also reverse the district court's take-nothing judgment on its attorney's-fees claim and remand the claim for reconsideration in light of its status as the prevailing party under our judgment. We will do so. *See Roberson v. City of Austin*, 157 S.W.3d 130, 137 (Tex. App.—Austin 2005, pet. denied).

Having sustained Harper Park Two's first issue, we need not address whether the district court abused its discretion in denying Harper Park Two's motion to reopen the evidence or for new trial. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We reverse the district court's judgment and render judgment declaring that Harper Park Two is entitled to develop Section Two as a hotel, office, or any other commercial use consistent with the rules, regulations, ordinances, and requirements in effect on July 30, 1985, and the zoning and restrictive covenants that the then-owners of the property voluntarily assumed between 1986 and 1992. We also reverse the district court's take-nothing judgment on Harper Park Two's attorney's-fees claim and remand that claim for reconsideration in light of our judgment.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Reversed and Rendered in part; Reversed and Remanded in part

Filed:   August 18, 2011

22