

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-20-00284-CV

---

CITY OF BUDA, APPELLANT

V.

N.M. EDIFICIOS LLC, APPELLEE

---

On Appeal from the 453rd District Court
Hays County, Texas
Trial Court No. 19-2627, Honorable David Junkin, Presiding

---

April 16, 2021

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Changing the rules in the middle of the game. That is what N.M. Edificios LLC said the City of Buda did. The game was called developing a business park on about 21 acres of land outside Buda's territorial boundaries and the rules dealt with water drainage. Edificios owned the land at time of suit, but its predecessor (Goforth LLC) began the game by creating a "Preliminary Plan for Buda Business Park Option A," dated March 9, 2007, and entering into a "Buda Business Park Agreement" (Agreement) with Buda on December 4, 2007. Under the Agreement, Goforth promised to convey a drainage

easement to Buda, while the latter agreed to construct all drainage facilities on that easement. The easement was conveyed and construction of some drainage facilities by Buda apparently occurred before Edificios came to own the property in 2012. Edificios also assumed the position of Goforth under the Agreement. Yet, when the new developer submitted its plans for a commercial business park to Buda for approval in 2017, they were rejected due to water drainage issues. To alleviate those supposed issues, Buda purportedly required Edificios to "construct and maintain certain drainage improvements on the property." But again, that allegedly was Buda's job under the Agreement and foisting the obligation upon Edificios was effort to change the rules in the middle of the game.

Edificios sued. Buda answered and filed a plea to the jurisdiction of the court. The trial court sustained the plea *viz* Edificios's "investment-backed-expectation takings claim" and request for specific performance "seeking to require [Buda] to take specific action within the drainage easement." It denied dismissal of Edificios's "Chapter 245 claims . . . pending resolution of fact issues by the fact finder." Buda appealed, asserting eight issues. We affirm in part and reverse in part.[1]

*Standard of Review*

The standard of review applied to issues like that at bar is discussed in *Tex. Dep't of Crim. Justice v. Rangel*, 595 S.W.3d 198 (Tex. 2019). We apply it here and refer the litigants to it. Thus, we begin our walk upon the game field to confront the morass of arguments proffered by Buda, as we understand them.

---

[1] Because this appeal was transferred from the Third Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this Court. *See* TEX. R. APP. P. 41.3.

*No Permit*

Edificios contended in its live pleading that the Agreement and easement granted Buda constituted a permit or permits. Being such, they allegedly vested rights enforceable under Chapter 245 of the Texas Local Government Code. Those rights purportedly were denied Edificios when Buda "attempt[ed] to impose new requirements and obligations on [Edificios]'s development project mid-stream [in violation of] Chapter 245 of the Texas Local Government Code." Buda initially argues here that neither documents were permits under that chapter of the Local Government Code. We overrule that contention.

Chapter 245 of the Code generally freezes the land-use regulations applicable to a land development project to those existing when the developer first applied for a permit. *Harper Park Two, LP v. City of Austin*, 359 S.W.3d 247, 249 (Tex. App.—Austin 2011, pet. denied). This circumstance arises from the Code's provisions that:

> (a) [e]ach regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time:
>
> (1) the original application for the permit is filed for review for any purpose, including review for administrative completeness; or
>
> (2) a plan for development of real property or plat application is filed with a regulatory agency.
>
> [and]
>
> (a-1) [r]ights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought . . . .

3

TEX. LOC. GOV'T CODE ANN. § 245.002 (a) & (a-1) (West 2016); *see Hatchett v. W. Travis Cty. Pub. Util. Agency,* 598 S.W.3d 744, 749 (Tex. App.—Austin 2020 pet. denied) (stating that upon filing of the first permit application, the project is deemed to have "'vested rights'" and is not subject to subsequently enacted regulations or changes). Furthermore, the rights (or vested rights) created by them attach to the project rather than the permit holder, and, consequently, follow any conveyance of the project to another. *River City Partners, Ltd. v. City of Austin*, No. 03-19-00253-CV, 2020 Tex. App. LEXIS 4301, at *3 (Tex. App.—Austin June 4, 2020, no pet.) (mem. op.). Statute further provides that if "a series of permits is required for a project" then "the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit . . . is filed shall be the sole basis for consideration of all subsequent permits." *Id.* § 245.002(b). So, "[a]ll permits required for the project are considered to be a single series of permits" and "[p]reliminary plans and related . . . plats, . . . plans, and all other development permits for land covered by the preliminary plans or . . . plats are considered collectively to be one series of permits for a project." *Id.*

To reiterate, Edificios alleged that the realty underlying the dispute lay outside Buda city limits but within its extraterritorial jurisdiction when the Agreement and easement were executed.[2] Statute authorizes a municipality to enter "a written contract with an owner of land . . . located in the [municipality's] extraterritorial jurisdiction" for certain purposes. *Id.,* § 212.172(b). One purpose consisted of providing "for

---

[2] *See* TEX. LOC. GOV'T CODE ANN. § 42.021 (West Supp. 2020) (defining a municipality's extraterritorial jurisdiction).

infrastructure for the land, including . . . land drainage." *Id.* § 212.172(b)(5)(C). More importantly, such agreements constitute "a permit under Chapter 245" of the same Code. *Id.* § 212.172(g). Thus, we disagree with Buda's proposition that the Agreement was not a permit. So, because the Agreement was a permit, then Edificios's promise to convey a drainage easement to Buda and Buda's reciprocal promise to construct "all drainage facilities on the drainage easement" were and are parts of the permit. Yet, the game continues. We must also determine whether to accept Edificios's proposition that Buda's attempt to foist upon it the duty to construct drainage improvements constitutes a change in the rules of the game under § 245.002(a).

We decide that issue by returning to the language of the statute. Again, it requires regulatory agencies to consider an application for permit "solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements *in effect at the time . . . the original application . . . is filed for review . . . or a plan for development . . . is filed.*" *Id.* § 245.002(a)(1) & (2) (emphasis added). Similarly, when additional permits to complete a project are sought, whether to issue them is also based on "the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements *in effect at the time the original application . . . is filed.*" *Id.* § 245.002(b) (emphasis added). The emphasized language describes a snapshot being taken of regulations, ordinances, rules, and other "properly adopted requirements" existing when the application was filed and applying them to the application. Logically, for those rules, regulations, and the like to be in existence at the time the application "is filed" they must necessarily preexist both the permit and the application for it; they must have already been enacted. *See Harper Park Two, LP*, 359 S.W.3d at 255 (stating that

the primary objective in construing a statute is to give effect to the legislature's intent and when the text is clear, the text determines that intent).

Here, the rule Buda is accused of trying to change in violation of § 245.002 relates to its contractual duty to construct all drainage facilities. Edificios believes that the obligation fell within the scope of § 245.002(a)'s and (b)'s "properly adopted requirements" verbiage by which applications for permit are tested. Yet, even if we were to assume that such a contractual obligation was a "properly adopted requirement," it nonetheless had to preexist execution of the Agreement, given our foregoing interpretation of the statute. It did not, though, for it arose from the Agreement, not from rules, regulations, and like "in effect at the time." Thus, Buda's contractual duty to build drainage facilities was and is not a regulation against which subsequent permits must be considered per § 245.002(b). Moreover, Edificios's arguments to the contrary are unavailing, as shown below.

First, we find nothing in § 212.172 of the Local Government Code stating that a development agreement (and its status as a permit) constitutes a regulation, rule, or other properly adopted requirement that existed prior to issuance of the permit or at the time the permit was sought. Nor does the snippet of legislative history underlying that statute and to which the developer cited so state; it does not provide that the legislature intended for the agreement or permit to gain the status of regulations or rules in effect at the time a permit was sought. Second, even if we were to accept the proposition that a development agreement executed under § 212.172 is a "properly adopted requirement," as suggested by Edificios, it was not "in effect at the time" the permit or agreement was sought.

6

As for Edificios's reference to Buda's own "Unified Development Code," the latter does provide that a development agreement "will be binding on the City and the developer when fully executed[] and will be subject to all of the provisions of Chapter 245 of the Texas Local Government Code." Yet, the agreement being subject to the provisions of Chapter 245 merely freezes the rules, regulations, and the like controlling it and ensuing permit applications. The Code snippet provided us says nothing about amending the language of § 245.002(a) and (b) to grant the development agreement the status of a preexisting regulation, rule, ordinance, or other adopted requirement.

As for the judicial opinions cited us, none deal with the specific question we address here. For instance, *City of San Antonio v. Rogers Shavano Ranch, Ltd.*, 383 S.W.3d 234 (Tex. App.–San Antonio 2012, pet. denied), dealt with standing and the exhaustion of administrative remedies. And, to the extent that it considered a "Water Report/Commitment and Sewer Report" to be a permit, *id.* at 243–44, it did not hold that either the commitment or report became a rule, regulation, ordinance, or requirement existing at the time the permit was sought. Indeed, it reiterated that the "effect of vested rights under Chapter 245 . . . is to 'freeze' the land use regulations as they existed at the time the first permit application was filed through completion of the 'project.'" *Id.* at 245–46. In so reiterating, it contemplated that the "freeze" encompassed "land use regulations" as opposed to promises made in the contract between the developer and governmental entity.

Similarly inapposite is *Harper Park*. The court there sought to determine the scope of the initial "project" for which a permit was sought and whether later effort to build a hotel came within it. *Harper Park Two, LP,* 359 S.W.3d at 249. The court was not asked

7

to decide if the terms of the initial permit granted by Buda became part of the regulations, rules, ordinances, and other requirements within the scope of § 245.002(a) and (b). Yet, the latter is the issue before us. And, to the extent that the *Harper* panel alluded to "zoning and restrictive covenants" arising after the date upon which the initial application was filed as being controlling, those ordinances and covenants were agreed to by the permit holder. *Id.* at 258–59. Statute allows *a permit holder* to take advantage of a change in the laws, rules, regulations, or ordinances that enhance or improve the project. TEX. LOC. GOV'T CODE ANN. § 245.002(d). So, the *Harper* court stating that the subsequently enacted zoning and restrictive covenants "voluntarily imposed on the property" *by the developer* became part of the controlling rules did not mean that obligations accepted by *a governmental entity* via an initial development agreement controlled issuance of future permits relating to the project.

In sum, we agree that the Agreement constitutes a permit. We disagree with the proposition that the contents of the Agreement necessarily became regulations, rules, ordinances, "or other properly adopted requirements in effect at the time" the permit was sought or issued. A contrary ruling is implicit in the trial court's decision to deny Buda's plea to the jurisdiction because there are fact issues as to Edificios's "Chapter 245 claims." Any purported fact issues are irrelevant given our legal construction of § 245.002(a) and (b) and the tenor of Edificios's argument. This is not to say that Buda has not changed the rules in the middle of the game. We mean only to say that the rules were not changed in a manner prohibited under Chapter 245 of the Local Government Code.

*Regulatory Taking*

Next, we address Edificios's claims of a regulatory taking. The trial court sustained that aspect of Buda's jurisdictional plea but granted Edificios opportunity to "amend its pleading to plead sufficient specific facts concerning damages or remove its investment-backed-expectations takings claim from its pleading." Edificios accepted that opportunity and amended its pleadings to aver additional facts concerning damages. Buda contends that it was not enough, and the regulatory takings claim should be dismissed. We disagree.

Our Supreme Court has recognized that a taking can occur when a governmental regulation has a severe enough economic impact and interferes with distinct investment-backed expectations. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 937 (Tex. 1998). "The reasonable investment-backed expectation of the claimant is critical to this analysis because it distinguishes this concept from those situations in which the landowner's property has been totally destroyed." *Id.* Despite the fact specific nature of takings claims, there is a general framework against which courts apply the individualized facts of alleged takings. *Hearts Bluff Game Ranch v. State*, 381 S.W.3d 468, 477–78 (Tex. 2012). That framework has several non-exclusive components. They consist of the economic impact of the regulation on the claimant, the character of the governmental action, and the extent to which the regulation interferes with the reasonable economic expectation of the property owner. *Id.*; *Tejas Motel, L.L.C. v. City of Mesquite*, No. 05-19-00667-CV, 2020 Tex. App. LEXIS 4225, at *15 (Tex. App.—Dallas June 4, 2020, pet. denied) (mem. op.); *Village of Tiki Island v. Premier Tierra Holdings Inc.*, 555 S.W.3d 738, 750–51 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The surrounding circumstances

may also be factored into the equation. *Village of Tiki Island*, 555 S.W.3d at 750–51. Yet, of utmost importance is the existence of a reasonable investment-backed expectation, for without one, no other factor matters.

As described in its third amended pleading, Edificios's purported reasonable investment-backed expectation consisted of Buda's contractual duty to construct all drainage facilities. It acquired the project from Goforth with that expectation in mind. Buda's effort to shirk that duty and demand that Edificios perform certain drainage improvements unreasonably interferes with the aforementioned expectation.[3] Buda's attempt to rebuff that contention here is focused solely on whether Edificios's expectation regarding Buda's performance of its contractual obligation was reasonable. Buda characterized it as unreasonable because 1) of the inapplicability of Chapter 245 to the Agreement, 2) the drainage improvements in question were previously required under Buda's development code and Austin's drainage manual, and 3) the contract provisions obligating Buda to construct all drainage facilities are void and unenforceable under the Texas Constitution and doctrine of governmental immunity.

At the risk of lulling readers into slumber, we feel it necessary to reiterate facts already mentioned. No one disputes that the parcel of land in question was intended to become a business park. Though Goforth initiated the effort, Edificios sought to complete it. And, to further that goal, Buda entered into the Agreement and assumed the obligation to "construct all drainage facilities on the drainage easement" obtained from Goforth. It

---

[3] The expectation consisted of constructing "(i) a regional drainage solution for drainage flow through the property (caused by surrounding properties) to alleviate flooding throughout the City, including the widening of the drainage channel on the City's drainage easement and changes to the overflow structures at the ponds in the City's neighboring park, Bradfield Park; and (ii) channel improvements throughout the property to accommodate the ultimate 100-year storm event from upstream properties within the watershed.

10

promised other things, as well, such as 1) maintaining the easement, 2) constructing an offsite detention facility for storm water coming from the land, and 3) building a bridge traversing the easement. So too did it expressly represent that the "Agreement **shall be binding on** and inure to the benefit of **the parties to it**." (Emphasis added). As also explained earlier, statute expressly allows municipalities, which includes Buda, to enter into such accords. TEX. LOC. GOV'T CODE ANN. § 212.172(b)(5)(B) & (C) (permitting the "governing body of a municipality [to] make a written contract with an owner of land . . . to: . . . provide for infrastructure for the land, including . . . street and road drainage [and] land drainage."). The very same statute also expresses that the "agreement between the governing body of the municipality and the landowner **is binding on the municipality** and the landowner and on their respective successors and assigns for the term of the agreement." *Id.* § 212.172(f) (emphasis added). A cynic may think it folly to believe a local governmental entity would fulfill its promises. Yet, we are not ready to adopt the position of a cynic but would rather believe such entities heed statutory edict. And the statute in play not only permits municipalities to enter agreements like that at bar but also renders them binding upon the municipality. Thus, § 212.172 cannot but grant a private entity an expectation that the local government with which it contracted will perform contractual duties created under the auspices of and permitted by § 212.172. And, given the statutory source of that expectation, we cannot but say it is a reasonable one. So, the expectation that Buda would "construct all drainage facilities" is a reasonable one since the obligation arises from an agreement encompassed within § 212.172. That preexisting ordinances and codes which Buda may have had does not change our position.

11

It may be that existing ordinances may lessen the reasonableness of an expectation. *See Mayhew*, 964 S.W.2d at 937–38 (recognizing that "existing zoning of the property at the time it was acquired is to be considered in determining whether the regulation interferes with investment-backed expectations"). We further acknowledge that the Unified Development Code to which Buda refers not only imposes drainage requirements and standards but also provides that the "[r]esponsibility for Proper Drainage Design and Construction Resides with Owner." Yet, no one has directed us to provisions in that or any other code barring the municipality from constructing drainage facilities if it so chose. Nor has anyone cited us to statutory authority resurrecting such a bar. On the other hand, statute expressly authorized the municipality to do that which it assumed in the Agreement, i.e., contract with the landowner to "provide infrastructure for the land, including . . . street and road drainage [and] land drainage." TEX. LOC. GOV'T CODE ANN. § 212.172(b)(5)(B) & (C). So, the aspects of Chapter 9 of the Unified Development Code to which Buda alluded do not alone negate the reasonableness of Edificios's expectation. The same is true regarding its arguments about the unenforceability of the contractual promises made in the Agreement.

As Buda observes, the Texas Constitution does provide that no debt shall ever be created or incurred by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund of at least two per cent thereon. TEX. CONST. art. XI, §§ 5 & 7. Those provisions were enacted with the intent to require municipalities to operate on a cash basis and limit their ability to pledge future revenues for current debts. *City of San Antonio v. San Antonio Firefighters' Ass'n*, 533 S.W.3d 527, 534 (Tex. App.—San Antonio 2017, pet. denied).

Yet, the operative word is "debt." The latter was defined years ago as meaning "any pecuniary obligation imposed by contract." *McNeal v. City of Waco*, 89 Tex. 83, 88, 33 S.W. 322, 324 (1895); *City of San Antonio*, 533 S.W.3d at 534 (quoting *McNeal, supra*). Yet, it did not encompass pecuniary obligations in good faith intended to be, and lawfully, payable out of either the current revenues for the year of the contract or any other fund within the immediate control of the municipality. *City of Houston v. Williams*, 353 S.W.3d 128, 139–40 (Tex. 2011) (quoting *McNeal, supra*). Nor does it include contracts extending over several years simply because they extend over several years. *City of San Antonio,* 533 S.W.3d at 536–37 (stating that a "multi-year contract entered into by a city is not *ipso facto* unconstitutional").

Nor are obligations that run current with revenues unconstitutional debts. *Charles Scribner's Sons v. Marrs*, 114 Tex. 11, 22, 262 S.W. 722, 725 (1924). Included within the latter are multi-year contracts which impose no obligation to pay until the service is needed and performed and the concomitant liability is incurred. *See id.* (concluding that the contract to use certain textbooks for five years was not a debt because the obligation to pay for them arose only upon their purchase and delivery in the year when needed). Under those circumstances, the governmental entity retains control over when the liability is fixed and monies become payable. *Id.* Such was the situation in *Charles Scribner*. The multi-year contractual obligation to buy books did not impose a duty to buy a fixed number or amount of books but only those needed each year. *Id.* Furthermore, the liability for their payment became fixed only for the amount of books requisitioned. *Id.* Consequently, the number of books bought for any year and the amount of money applied thereto was wholly within the control of the school authorities, and the arrangement fell

outside the scope of a debt, for constitutional purposes. *Id.*; *accord Tyler v. L.L. Jester & Co.*, 97 Tex. 344, 360, 78 S.W. 1058, 1062 (1904) (concluding that a debt was not created because the multi-year contract for water to be delivered in the future involved a liability arising upon the use of the water during each year).

Here, Buda's obligation to construct drainage facilities has no expiration date. Nor does the Agreement specify a particular year in which its obligations must be performed. Similarly missing is verbiage specifying the extent of any construction that must occur at any particular time or in any particular year. Apparently, the obligation to construct follows need; if there is no need for drainage facilities, there is no need to build them under the Agreement. And, most interestingly, one cannot doubt that Buda retains authority over its own ordinances and, thus, retains the authority over its own ordinances that regulate drainage and its necessary extent. So, the situation before us is rather comparable to those in *Tyler* and *Charles Scribner*. Buda's obligation under the Agreement may be multi-year, but the accompanying pecuniary liability is indefinite and within its annual control. Unless facilities are built, pecuniary liability for same does not arise. Moreover, payment of that liability may be planned for and made from the annual budget of Buda, much like the situations in *Charles Scribner* and *Tyler*. So, its contractual obligation arising under the Agreement avoids being a "debt" under the aforementioned constitutional provisions.

As for the remaining ground of attack Buda levies, i.e., the matter of Buda performing a discretionary function, Buda's reference to *Watauga v. Taylor*, 752 S.W.2d 199, 202 (Tex. App.—Fort Worth 1988, no writ.), is informative, but irrelevant. The *Watauga* panel did hold that the construction of sewers and drains was a discretionary

14

function of the governing body. *Watauga*, 752 S.W.2d at 202. So too did it hold that one has no cause of action against the governmental body for failing to provide drainage improvements. *Id.* Yet, the cause of action pursued in *Watauga* was not a takings claim, like the one at bar.[4] Nor did the Taylors execute a contract with the City of Watauga under which the latter agreed to complete drainage improvements. Nor did anyone argue that a governmental entity's contract to perform a discretionary function is invalid because the nature of the obligation implicates a discretionary function. So, *Watauga* hardly controls our situation. But other authority does. For instance, our Supreme Court recognized that by executing a contract, a governmental entity "voluntarily bind[s] itself like any other party to the terms of agreement." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). So too does the act of contracting effectively waive immunity from liability. *Id.* In other words, the contract binds the entity and exposes it to liability for breaching it, though that liability cannot be enforced through a lawsuit without legislative consent. *Leach v. Tex. Tech Univ.*, 335 S.W.3d 386, 392 (Tex. App.—Amarillo 2011, pet. denied) (stating that when a governmental entity contracts with another, "it must perform and, like any other party to a contract, is responsible for its failure to do so, [but] it cannot be sued for damages without its permission if it opts to forego performance"). This means, then, that Buda's contractual agreement to construct drainage facilities is binding upon it. The obligation being binding, its theretofore discretionary nature lacks the effect of rendering Edificios's expectations under the Agreement unreasonable.

---

[4] Edificios is not suing for breach of contract. Nor is it suing to compel Buda to construct the drainage facilities. Rather, the investor seeks to be relieved of having to perform obligations that Buda had contracted to do under the Agreement. That Buda had so contracted is the expectation allegedly taken from Edificios.

15

*Land Use Exaction*

Next, we address Edificios's alternate takings claim involving a land use exaction. Such a claim may arise when a governmental entity conditions its approval of a development project on the landowner providing or doing something or exacting something from the landowner. *City of Carrollton v. HEB Parkway South, Ltd.*, 317 S.W.3d 787, 793 (Tex. App.—Fort Worth 2010, no pet.). Here, Edificios alleged that the "Drainage Improvements required by the City . . . constitute land use exactions." Buda asserts on appeal, for the first time, that its opponent has neglected to illustrate that the exaction claim is ripe for consideration. That is, Edificios supposedly failed to tender evidence that Buda finally denied the developer the opportunity to pursue its project unless the improvements were completed. By so failing, the developer supposedly neglected to illustrate that its exaction claim was ripe for adjudication.

At least one court of appeals has stated that "as a prerequisite to the ripeness of regulatory takings claims, there must be 'a final decision regarding the application of the regulations to the property at issue.'" *Id.* at 794 (quoting *Mayhew,* 964 S.W.2d at 929). This same authority applied the rule to a regulatory exaction claims, like that urged by Edificios. *Id.* at 795. Here, Edificios averred in its live pleading that Buda "denied approval of [Edificios]'s 2017 Plan claiming [the latter's] development would increase the floodplain elevation and requiring—as a condition of the development's approval—that [Edificios] construct and maintain certain drainage improvements on the property in order to receive a 'no rise certification.'" That tends to aver that Buda made a final decision regarding Edificios's development plans. Moreover, Buda does not cite us to evidence negating that allegation, as was its burden. *Unifund CCR Partners v. Watson*, 337 S.W.3d

16

922, 926 (Tex. App.—Amarillo 2011, no pet.) (stating that the defendant has the burden to assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacked subject-matter jurisdiction before the plaintiff has to present evidence sufficient to raise a material issue of fact regarding jurisdiction). Yet, even if it had and Edificios did not respond with evidence illustrating the presence of jurisdiction, that would not be fatal. As our Supreme Court said in *RSL Funding, LLC v. Pippins*, 499 S.W.3d 423 (Tex. 2016) (concerning the jurisdictional element of standing), "when an appellate court is the first to consider jurisdictional issues, it construes the pleadings in favor of the plaintiff and, if necessary, reviews the record for evidence supporting jurisdiction." *Id.* at 429. If jurisdiction has not been shown, "but the pleadings and record do not demonstrate an incurable jurisdictional defect, the case will be remanded to the trial court where the plaintiff is entitled to a fair opportunity to develop the record relating to jurisdiction and to replead." *Id.* Here, the pleadings and record do not demonstrate an incurable jurisdictional defect. Moreover, the jurisdictional attack Buda currently levies was not raised below. Thus, we would be obligated to and will remand the matter to the trial court with directions to afford Edificios "fair opportunity to [factually] develop the record relating to jurisdiction."

*Attorney's Fees*

Finally, Buda asserts that the trial court should have dismissed Edificios's claim for attorney's fees. Dismissal purportedly is required due to its governmental immunity.[5] We agree.

---

[5] Edificios did not address this issue in its appellee's brief.

Normally, a governmental entity is immune from an award of attorney's fees unless that immunity is waived. Because Edificios failed to address Buda's attorney's fees issue within its appellee's brief, it did not assist us in determining the relevant statute or law purportedly waiving that immunity. Nevertheless, to the extent that the developer sought to rely on the waiver and attorney's fee provisions within Chapter 245 of the Local Government Code, its reliance would be misplaced. *See* TEX. LOCAL GOV. CODE. ANN. § 245.006(b) (West Supp. 2020) (waiving governmental immunity "in regard to an action under this chapter"); *see also id.* § 245.006(c) (permitting the court to award court costs and reasonable and necessary attorney's fees to the prevailing party). This is so due to our earlier determination that the chapter does not encompass Edificios's claims.

Similarly unavailable is the Uniform Declaratory Judgment Act and the portion that authorizes a trial court to award attorney's fees in certain disputes encompassed within it. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2020) (stating that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just"). Edificios does seek declaratory relief. Yet, governmental immunity is waived under the act to the extent that the validity of statutes or ordinances are in play. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009); *accord City of Dallas v. Turley*, 316 S.W.3d 762, 768 (Tex. App.—Dallas 2010, pet. denied) (citing *Heinrich* and stating "the waiver of immunity under section 37.006 does not include all suits that could be brought under section 37.004"). That is, "[s]ection 37.006 only waives immunity for 'claims challenging the validity of ordinances or statutes.'" *City of Dallas*, 316 S.W.3d at 768. Edificios does not challenge the validity of

18

a statute or ordinance.  Thus, we find no basis upon which to hold that Buda's immunity from attorney's fees was waived.

In sum, we reverse the trial court's order to the extent it directed that 1) "Defendant's First Amended Plea to the Jurisdiction as to Plaintiff's Chapter 245 claims is DENIED at this time, pending resolution of fact issues by the fact finder" and 2) "Defendant's First Amended Plea to the Jurisdiction as to Plaintiff's investment-backed-expectation takings claim . . . is SUSTAINED without prejudice."  The first amended plea to the jurisdiction is sustained regarding Edificios's claim founded upon Chapter 245 of the Local Government Code, and it is dismissed for want of jurisdiction.  The same plea is denied as to Edificios's investment-backed expectation and land use exaction takings claims.  We further sustain the plea as to Edificios's demand for attorney's fees against Buda; it too is dismissed.  In all other things, the trial court's order is affirmed.

Brian Quinn
Chief Justice