Levoy **HART**, Appellant,

v.

**CITY OF DALLAS**, Appellee.

No. 1117.

Court of Civil Appeals of Texas, Tyler.

April 20, 1978.

Michael M. Daniel, Dallas Legal Services Foundation, Inc., Dallas, for appellant.

Linda R. Lawson, Asst. City Atty., Dallas, for appellee.

McKAY, Justice.

Appellant, Levoy Hart, filed suit against the City of Dallas alleging that the City of Dallas had ordered the demolition of his residence at 6723 Hialeah Street, Dallas, because such residence was not in compliance with the City of Dallas Minimum Urban Rehabilitation Standards Code and asking for a temporary and a permanent injunction against the City to prevent the ordering or accomplishment of the demolition of the premises. Appellee, City of Dallas, answered by general denial and alleged that the premises of appellant were in violation of the Urban Rehabilitation Standards Ordinance of the City of Dallas and other codes and ordinances of the City, and were unfit for human habitation and constitute nuisances and hazards under the ordinances of the City and the laws of the State of Texas.

Trial was had before the court without a jury, and the court entered judgment that the permanent injunction prayed for be denied and that a temporary order which enjoined the City from demolishing the residence be in all things dissolved.

The trial court made findings of fact and conclusions of law as follows:

### "FINDINGS OF FACT

#### I.

"That Plaintiff is the owner of the property and structure located at 6723 Hialeah Street within the City of Dallas.

#### II.

"That the structure and property fails to meet minimum standards of the Dallas Building Code.

#### III.

"That the owner of the property was first notified of this noncompliance by certified letter mailed in September, 1974; that thereafter there were numerous contacts with the owner by Urban Rehabilitation Inspectors seeking voluntary compliance; that because the owner failed to repair his property, notice was served on said owner, Plaintiff in this cause, of a hearing before the Urban Rehabilitation Standards Board to be held on February 11, 1976; that after said hearing with all parties present, Plaintiff was given seventy (70) days by the Urban Rehabilitation Standards Board in which to obtain a building permit and rehabilitate his property with the condition that the failure to so repair would be cause for issuance of a demolition order; that on May 12, 1976, the Urban Rehabilitation Standards Board found that Plaintiff had failed to comply with its order and issued a demolition order; that on June 23, 1976, Plaintiff's appeal of this order was denied; that in mid-August of 1976, Plaintiff was permitted another hearing before the Urban Rehabilitation Standards Board, at which time the order for demolition was sustained.

#### IV.

"That among the violations contained on said property are, but not limited to, the following:

"A. Structural violations;

(1) Protect exterior surfaces;

(2) Provide and maintain railings for steps;

(3) Repair holes and cracks in steps;

(4) Maintain structure in weather tight and water tight condition;

(5) Maintain floors, walls, ceilings and all structural members in sound condition;

(6) Repair hot water heater connection;

(7) Repair holes, cracks, and breaks in walls and ceilings.

"B.   Utility violations:

(1) Disposal of food and waste impossible;

(2) No potable water;

(3) Connect plumbing and heating fixtures.

## V.

"That the owner has been given opportunity to repair these violations and has failed to do so.

## VI.

"That the only repairs which have been made to the structure are cosmetic and not structural.

## VII.

"That the house is structurally unsound due to failure of the foundation and support beams.

## VIII.

"That to repair this structure to meet the minimum standards of the Dallas Building Code would require substantial reconstruction of the said structure.

## "CONCLUSIONS OF LAW
## I.

1.   "(b) *Structural standards.* An owner shall:

(1) protect the exterior surfaces of a structure which are subject to decay by application of paint or other coating;

(2) fill hollow, masonry supporting piers, if used, with concrete and anchor the piers to concrete footings with a ⅝″ steel dowel;

(3) provide and maintain railings for stairs, steps, balconies, porches, and elsewhere as specified in the Dallas Building Code;

(4) repair holes, cracks, and other defects reasonably capable of causing injury to a

"That all requirements of the Dallas City Code were met, the Plaintiff was afforded an opportunity to be heard and the demolition order is fair and reasonable.

## II.

"That the property in question is maintained in such a manner as to be unfit for human habitation and is a nuisance.

## III.

"That Plaintiff is not entitled to injunctive relief preventing the City of Dallas from implementing its demolition order."

Appellant first complains that the trial court erred in entering judgment for appellee on its finding and conclusion that appellant's house constituted a nuisance because there was no evidence to support such a finding or conclusion, and because such finding and conclusion were supported by factually insufficient evidence. It is necessary to detail the evidence with particularity in order to address ourselves to these two complaints.

The witness D. H. Conner, coordinator of Codes Compliance for the City of Dallas for nine years, testified that it was his duty to oversee and be the liaison between the City of Dallas and the Urban Rehabilitation Standards Board and oversight for the gathering of evidence to present in actions in the district court or the municipal courts related to violations of the City codes. He further testified that the trim on the brick structure belonging to appellant was deteriorated and daylight could be seen through some of those holes; that there was a violation of clause (3) of subsection (b) of section 27–11 of Ordinance No. 15,198,[1] in that

person in stairs, porches, steps and balconies;

(5) maintain a structure intended for human occupancy in a weather-tight and water-tight condition;

(6) maintain floors, walls, ceilings and all supporting structural members in a sound condition, capable of bearing imposed loads safely;

(7) provide cross-ventilation of not less than 1½ square feet for each 25 lineal feet of wall in each basement, cellar, and crawl space;

there were repair holes, cracks and other defects capable of causing injury to a person on the stairs, porches, steps and balconies; that with respect to subsection (5) there was "evidence of some cracks which communicated from the exterior of the structure and were reflected by breaks on the wall on the inside and a gypsum board on the inside walls of the structure such that they were not weather tight; that there was differential settlement in the brick, especially at the corners of the structure, both rear corner and the front corner—and evidence of the differential settlement of the monolithic slab in such areas which cause settlement and breaks to appear; that the west wall of the structure had pulled away on the inside on the load-bearing partition between the living room and the dining room a distance of several inches, and the west wall is not plumb by several degrees."

He further testified as to utility standards that he believed that there was no down-draft diverter in the hot water heater flue connection; that as of mid-March, 1976, there was no electric power connected to the house, and no gas there, and no water; and it would be impossible without gas or electricity to light the house, and without water, to dispose of human waste and other waste; there would not be potable water nor a device to supply a hot water heater at a constant water temperature of 120° Fahrenheit; that subsection (c)(5) (to provide and connect a kitchen sink, bathtub or shower, and lavatory to a cold and hot water source) could not be complied with without water; that without gas there was no facility to provide heating equipment capable of maintaining a minimum of 68° Fahrenheit; that there was no solid fuel burning equipment (appellant testified that as of the date of trial water and electricity were connected but the gas was not connected).

Conner further added that if the defects were not corrected there would be a major failure of the brick veneer; that there was damage to the roof sheeting (sic); that in his opinion, by definition of the ordinance, the house was not fit for human habitation as it then stood, and that for the house to be brought up to the code standard would involve a major reconstruction, if not a complete rebuilding of the structure; that to repair the house properly would cost from $12,500 to $15,000; that after the house was under an order of demolition, the power company and the gas company were asked to remove the electric and gas meters and discontinue such service at that location

(8) repair or replace chimney flue and vent attachments that do not function properly;

(9) repair holes, cracks, breaks, and loose surface materials that are health or safety hazards in or on floors, walls, and ceiling; and

(10) provide and maintain a moisture-resistant finish or material for the floor on each bathroom, shower room, and toilet room.

"(c) *Utility standards.* An owner shall:

(1) provide and maintain connections to discharge sewage from a structure or land into a public sewer system where available;

(2) provide and maintain a toilet connected to a water source and to a public sewer, where available, in each structure intended for human habitation;

(3) provide and maintain connections and pipes to supply potable water at adequate pressure to a structure intended for human occupancy;

(4) provide and maintain a device to supply hot water of a constant minimum temperature of 120° Fahrenheit within each structure intended for human habitation;

(5) provide and connect a kitchen sink, bathtub or shower, and lavatory to a cold and hot water source in each structure intended for human habitation;

(6) connect plumbing fixtures and hearing equipment that the owner supplies in accordance with the Dallas Plumbing Code and Dallas Mechanical Code;

(7) provide heating equipment capable of maintaining a minimum inside temperature of 68° Fahrenheit or utility connection for such equipment in each room of a structure intended for human occupancy;

(8) provide and maintain supply lines for electrical service to each structure intended for human occupancy if electrical service is available within 300 feet;

(9) connect each heating and cooking device that burns solid fuel to a chimney or flue; and

(10) provide and maintain electrical circuits and outlets sufficient to safely carry a load imposed by normal use of appliances and fixtures."

for reasons of fire, health and life safety, and to prevent other persons from making unauthorized entry and perhaps setting fire to it; that service was restored after this suit was filed and an order issued by the court; that the slab could be corrected by hydraulic pressure using quick-setting cement for approximately $10,000, and to put piers down to correct it would cost approximately $7,500, and shoring it up and putting in piers would approximate $5,000 to $6,000, but if appellant did the work himself it could be done for about one-half of these amounts.

There was introduced in evidence an "O.K." tag by the City plumbing inspector as of April 22, 1977.

The witness Leon Hurse, an employee of the City of Dallas Public Works Department, Property Management Division, as a real estate appraiser who had been such appraiser for eleven years, testified that he had a B.S. Degree from East Texas State University, and had real estate appraisal courses at Southern Methodist University and real estate law and property management from S.M.U., and had done appraisal work since 1949. Hurse further testified that his estimate of the cost of repairing the house was about $16,250, and that the repairs needed were foundation (considerable), roof, interior walls, floor, electrical work, plumbing, and replace the front porch and various overall repairs to bring the house up to the City of Dallas Code standards; that if these repairs were made the house would have a value of from $22,000 to $24,750; that the house would probably have a negative value for prospective buyers in its then condition, and the lot probably would have more value without the house on it, and it would not be economically feasible to make the necessary repairs and "would be best just to tear it down and start from scratch"; that without making any repairs the house and lot would be worth about $4,500, and that to repair the house would cost approximately $2,500 for foundation, $1,500 for the roof, $2,200 for the floors and walls, $650 for the electrical work, $2,300 for plumbing, to replace broken walls in front would be $2,100, to re-place windows and other exterior work such as doors would be $1,750, and to repair the overhang and additional repairs to the roof would be $2,650.

The witness Fay Catledge testified that she lives across the street from the appellant's house in question, the third house east from appellant's location, and that appellant brought in large concrete pipe and built what he called a bomb shelter and left construction materials on the property for a long time, and that the property was unkept.

The witness Dave Hill formerly lived three houses down Hialeah Street from appellant Hart and Hill testified that appellant's house has deteriorated over the years with debris in the yard and stagnant water remaining on the property, fences and trees falling down and trees falling on one of his houses as well as appellant's house; that appellant's house stood vacant for a number of years and has depreciated; that he observed cracks six inches wide in the kitchen wall and he assumed the cause was the shifting of the foundation; that he was not able to keep rented one of his houses next door to appellant because of the condition of appellant's house; that even though appellant's house looks better because he has repainted it in his opinion it should be demolished because it was not worth fixing; that in his opinion the house could be brought up to minimum code standards for approximately $10,000, and after that money was spent the market value of the house would be approximately $22,000 to $24,000.

The record reveals that the appellant's house was vacant and had been vacant for a number of years and was vacant at the time of trial.

Appellant contends that the court's finding of nuisance is material because the City of Dallas had the burden of alleging and proving that the house involved was in fact a nuisance. Citing *Crossman v. City of Galveston,* 112 Tex. 303, 247 S.W. 810 (1923), and *City of Houston v. Lurie,* 148 Tex. 391, 224 S.W.2d 871 (1949).

Both *Crossman* and *Lurie* are distinguishable from the case at bar. However, for reasons we will state later, the principles of law pronounced in *Crossman* and followed in *Lurie* are applicable to the facts before us. Both cases involved attempts by a municipality to condemn and demolish certain buildings pursuant to City ordinances. The ordinances in question were enacted pursuant to the enumerated powers under Article 1175, secs. 19 and 25, Tex.Rev.Civ.Stat. Ann., or the previous article from which it was derived.[2]

Article 1175 reads in pertinent part:

"Cities adopting the Charter or amendment hereunder shall have full power of local self-government, and among the other powers that may be exercised by any such city the following are hereby enumerated for greater certainty:

.    .    .    .    .

"19.   Each city shall have the power to define all nuisances and prohibit the same within the city and outside the city limits for a distance of five thousand feet; .    .

.    .    .    .    .

"25.    .    .    .   to provide for the condemnation of dangerous structures or buildings or dilapidated buildings or buildings calculated to increase the fire hazard, and the manner of their removal or destruction."

Additionally, the ordinances in both cases defined certain types of structures as nuisances and provided for their demolition. In neither case was the owner provided an opportunity to repair the structure in order to abate the alleged nuisance conditions.

Turning to the facts before us, the City of Dallas ordinance was enacted pursuant to Section 35, Art. 1175, Tex.Rev.Civ.Stat. Ann. (Supp.1978), which reads:

"35.   A home-rule city may adopt an ordinance which requires the demolition or repair of buildings which are dilapidated, substandard, or unfit for human habitation and which constitute a hazard to the health, safety, and welfare of the citizens.   The ordinance must establish minimum standards for continued use and occupancy of structures, and these standards shall apply to buildings regardless of when they were constructed.   The ordinance must provide for proper notice to the owner and a public hearing.   After the hearing, if the building is found to be substandard, the city may direct that the building be repaired or removed within a reasonable time.   After the expiration of the allotted time the city has the power to remove the building at the expense of the city and assess the expenses on the land on which the building stood or to which it was attached and may provide for that assessment, the mode and manner of giving notice, and the means of recovering the removal expenses.   The means of recovering removal expenses may not include forced sale of the land by the city."

Article IV, Ordinance No. 15198, amending Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code, provides for demolition of substandard structures after notice to the owner and a public hearing before a panel of the urban rehabilitation standards board.   After hearing evidence the panel may (1) find the structure is not substandard, (2) grant a variance, (3) in the case of a single family dwelling, grant an exception to avoid the imposition of an unreasonable hardship, (4) find that the structure is substandard and order repair or other suitable remedy within a specified period of time, or (5) order the demolition of the structure within a specified period of time.   As detailed in the court's findings of fact, the City of Dallas followed all procedures required under the statute and the ordinance.

█  Under the statute, a home rule city may demolish a structure which is either dilapidated, substandard, or unfit for human habitation *and* which constitutes a hazard to the health, safety, and welfare of the citizens.   Section 27–13 of Ordinance No. 15198 states that a structure is substandard if the owner of the structure fails to comply

2.   Tex.Rev.Civ.Stat., art. 1096d (1914).

with one or more of the minimum standards of Section 27–11, *and* the structure is a hazard to the health, safety and welfare of an occupant or other person. Therefore, under both the statute and the ordinance, before a structure may be demolished, it must be found to be a hazard to the health, safety, and welfare of the public. We are then presented with the question of whether a municipal administrative body is empowered to make such a finding, and pursuant thereto, order or permit demolition—or whether such a finding that a structure is a nuisance in fact must be made by a court of competent jurisdiction before it may be demolished. That question is answered by *Crossman* and later cases following its holdings. We are bound to follow *Crossman's* holdings for two reasons. Obviously, a condition which is a hazard to the health, safety and welfare of the public falls within any possible definition of nuisance, and the property rights involved here are virtually identical to those involved in *Crossman* and its progeny.

We point out here that the question of the validity of the ordinance is not before us, and we express no opinion on that question.

■ "A citizen's property, not a nuisance within itself or under the common law, cannot be destroyed without the judgment of a court finding that it is in fact a nuisance. . . . If in fact this property is a nuisance, the decree of a court of competent jurisdiction must first adjudge it to be so before the property may be lawfully destroyed. [Citations omitted.]" *Crossman v. City of Galveston*, supra at 813. Neither the Legislature nor the city council can by a declaration make that a nuisance which is not in fact a nuisance, and the question as to whether or not a building is a nuisance is a justiciable question, determinable alone by the court or jury trying the case. Whether the building in controversy is in fact a nuisance is to be established by legal and competent evidence, in the same manner as any other fact, and the burden is upon the City to do this. *City of Texarkana v. Reagan*, 112 Tex. 317, 322–323, 247

S.W. 816, 817–818 (1923). *City of Houston v. Lurie*, supra at 875. See also *Bielecki v. City of Port Arthur*, 12 S.W.2d 976 (Tex. Com.App.1929, judgmt adopted); *Hill v. Villarreal*, 383 S.W.2d 463, 466–467 (Tex. Civ.App.—San Antonio 1964, writ ref'd n. r. e.); *City of Houston v. Adams*, 326 S.W.2d 627, 631 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.); *Mast v. Oakley-Metcalf Funeral Home*, 101 S.W.2d 819 (Tex.Civ.App. —Beaumont 1937, no writ).

■ The record does not reflect whether the Urban Rehabilitation Standards Board made a determination that the house was a hazard to the health, safety and welfare of the citizens, or whether the city council made such a determination. However, had the Board or the council made such a determination, in our view, the City would have been without authority to demolish the house in the absence of a judicial determination that the house was a nuisance in fact. *City of Texarkana v. Reagan*, supra at 817; *City of Carthage v. Allums*, 398 S.W.2d 799, 804 (Tex.Civ.App.—Tyler 1966, no writ).

The trial court's finding that appellant's house is "unfit for human habitation and is a nuisance" recognizes the applicability of the foregoing cases. In effect the court found the house to be a hazard to the health, safety and welfare of the public, and such finding was necessary before the City could demolish the structure.

In considering appellant's argument that there is no evidence to support the court's finding that the house was a nuisance, we may consider only the evidence and inferences in support of the finding while disregarding all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In view of the evidence already detailed, we hold that there is more than a mere scintilla of evidence to support the court's finding. Appellant's point one is overruled.

■ In examining the factual sufficiency of the evidence to support the court's finding, we must consider the whole record to determine if the court's finding is so

**380**

against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). After a review of the entire record and after having weighed and balanced all the evidence, both that in favor of and against the judgment, we hold the trial court's finding that the house is a nuisance is not supported by sufficient evidence. Appellant's point two is sustained.

It is settled law that the grant or refusal of an injunction is ordinarily within the sound discretion of the trial judge, and his action will be reversed only when a clear abuse of that discretion occurs. *Repka v. American National Ins. Co.*, 143 Tex. 542, 186 S.W.2d 977, 981 (Tex.1945); *Bull and Bear Club, Inc. v. San Antonio Bull and Bear Club*, 424 S.W.2d 489, 490 (Tex.Civ. App.—San Antonio 1968, no writ); *King v. Miller*, 280 S.W.2d 331, 333 (Tex.Civ.App.— Eastland 1955, writ ref'd n. r. e.). In view of our holding that the evidence was insufficient to support the trial court's finding of nuisance, we hold that the trial court abused its discretion in refusing to grant the injunction.

In his points of error three and four appellant complains that the trial court erred in entering judgment for defendant on its finding that appellant's house could not be repaired so that it was not a nuisance without substantial reconstruction because there was no evidence to support such a finding, and because such finding was against the great weight and preponderance of the evidence. In view of our holding as to appellant's point two, these latter points are immaterial to our disposition of the case.

The judgment of the trial court is reversed, the order dissolving the temporary injunction is set aside, and the cause remanded to the trial court.