# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00668-CV

---

**John Hatchett, Sandra Hatchett, and JPH Capital LLP, Appellants**

**v.**

**West Travis County Public Utility Agency, Appellee**

---

### FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001654, THE HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING

---

### O P I N I O N

John and Sandra Hatchett and JPH Capital LLP (collectively, the Hatchetts) appeal the trial court's order granting the plea to the jurisdiction filed by the West Travis County Public Utility Agency (the PUA) and dismissing the Hatchetts' petition. In its plea, the PUA contended that the Hatchetts do not have standing and that it is immune from suit. The Hatchetts' petition sought declarations invalidating the PUA's "policies, rules, and regulations" limiting density and impervious coverage on their property and granting them vested-rights protection under Chapter 245 of the Local Government Code (LGC) due to a prior permit application for water service. *See* Tex. Loc. Gov't Code § 245.002(a) (requiring regulatory agencies to consider approval of permit application solely on basis of regulations in effect when original application for permit is filed). For the following reasons, we will affirm the trial court's order in part and reverse and remand the order in part.

## BACKGROUND[1]

The Hatchetts filed this lawsuit in April 2018. In their live (third amended) petition, they alleged that they owned approximately 910 acres of land in Travis County (the Property) for several years and in 2013 entered into an agreement with Masonwood Development, Inc. that "set forth a takedown schedule with Masonwood purchasing and developing the Property in phases." When the petition was filed, "Masonwood ha[d] obtained title to a portion of the Property" but the "Remainder Property" was "still owned by [the] Hatchett[s]."

In May 2013, Masonwood submitted to the PUA[2] a "service extension request" (SER), seeking water service for the Property. At the time, the PUA's tariff "did not impose lot impervious coverage [] restrictions as a condition of receiving service." In November 2013, the PUA issued Masonwood a "service availability letter" with proposed conditions for the provision of water service for up to 1837 LUEs,[3] to be memorialized in a future "non-standard service agreement" (NSSA). Masonwood and the PUA executed the NSSA in March 2015. The agreement provided for the PUA's provision of retail water service to the development equivalent to 700 LUEs.

In August 2016, the Hatchetts submitted to the PUA a second SER to obtain service for the Remainder Property for the additional 1137 LUEs originally contemplated to develop the Property. In March 2017, the PUA's Board met, considered, and denied the second SER "in its entirety." In January 2018, the PUA's Board amended its tariff, which amendments

---

[1] We have derived the facts in this section from allegations in the Hatchetts' live petition.

[2] The PUA is a public utility agency and political subdivision created and operating under Chapter 572 of the LGC. *See* Tex. Loc. Gov't Code §§ 572.051, .052(c).

[3] LUE stands for "living unit equivalent."

2

"require" the Hatchetts "to comply with impervious coverage requirements of governmental entities other than the []PUA" to obtain service to the Remainder Property.

The Hatchetts sought the following declaratory judgments: (1) the PUA's "policies, rules, and regulations limiting density and impervious coverage on the Property" are "null and void" because they (a) "are unauthorized and violate the powers given to public utility agencies" in Chapter 572 of the LGC, *see id.* § 572.058, and (b) "violate Article XVI, Section 59 of the Texas Constitution because these powers are reserved to conservation and reclamation districts which are created in accordance with the Constitution and statute," *see* Tex. Const. art. XVI, § 59; and (2) the PUA's "policies, rules, and regulations enacted after the first permit [Masonwood's SER] for the project on the Property was submitted to the []PUA cannot be applied to the Property" under the vested-rights protections provided in Chapter 245 of the LGC, *see* Tex. Loc. Gov't Code § 245.002.

## STANDARD OF REVIEW

A plea to the jurisdiction seeks to dismiss a cause of action regardless of whether the claim has merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). A plea to the jurisdiction is a dilatory plea that challenges the trial court's power to adjudicate the subject matter of the controversy. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Whether a party has alleged facts that affirmatively demonstrate a trial court's subject-matter jurisdiction and whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction are questions of law that we review de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve

3

the jurisdictional issues. *Bland*, 34 S.W.3d at 555. If the evidence raises a fact issue regarding jurisdiction, the plea to the jurisdiction cannot be granted, and a factfinder must resolve the issue. *Miranda*, 133 S.W.3d at 227–28.

## DISCUSSION

***Vested rights in Chapter 245***

Under Chapter 245 of the LGC, once an application for the first permit required to complete a property-development project is filed with the agency that regulates such use of the property, the agency's regulations applicable to the project are effectively "frozen" in their then-current state and the agency is prohibited from subsequent regulatory changes to further restrict the property's use. *Harper Park Two, LP v. City of Austin*, 359 S.W.3d 247, 248–49 (Tex. App.—Austin 2011, pet. denied); *see* Tex. Loc. Gov't Code § 245.002(b) ("Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time . . . the original application for the permit is filed for review for any purpose . . . ."). Chapter 245 defines a "permit" as

> a license, certificate, approval, registration, consent, permit, contract or other agreement for construction related to, or provision of, service from a water or wastewater utility owned, operated, or controlled by a regulatory agency, or other form of authorization required by law, rule, regulation, order, or ordinance that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought.

Tex. Loc. Gov't Code § 245.001(1). Upon filing of the first permit application, the project is considered to have "vested rights" and "is not subject to intervening regulations or changes after

4

the vesting date." *City of San Antonio v. Rogers Shavano Ranch, Ltd.*, 383 S.W.3d 234, 245 (Tex. App.—San Antonio 2012, pet. denied); *see* Tex. Loc. Gov't Code § 245.002(a).

A "project" is defined as "an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." Tex. Loc. Gov't Code § 245.001(3). A "project," for purposes of vested rights, is the single endeavor reflected in the original application for the first permit in a series, rather than individual components of the larger, original endeavor that could subsequently require separate permits. *Harper Park Two*, 359 S.W.3d at 256. Rights vest in a particular project, not in the property itself; therefore, subsequent changes in ownership of the property do not affect the vested rights. *City of San Antonio v. En Seguido, Ltd.*, 227 S.W.3d 237, 242–43 (Tex. App.—San Antonio 2007, no pet.). "The obvious intent of chapter 245 is to prohibit land-use regulators from changing the rules governing development projects 'in the middle of the game.'" *Harper Park Two*, 359 S.W.3d at 250.

### Whether the Hatchetts have standing

Standing requires: (1) a real controversy between the parties that (2) will be actually determined by the judicial declaration sought. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005); *Rogers Shavano Ranch*, 383 S.W.3d at 242. Without standing, a court lacks subject-matter jurisdiction to hear the case. *Lovato*, 171 S.W.3d at 849. A determination of standing focuses on whether a party has a "justiciable interest" in the outcome of the lawsuit, such as when it is personally aggrieved or has an enforceable right or interest. *Id.* As a component of subject-matter jurisdiction, standing is a question of law reviewed de novo. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). To have standing,

the pleader bears the burden of alleging facts that affirmatively demonstrate the court's jurisdiction to hear the cause, *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993), and when reviewing a standing ruling, we construe the petition in favor of the pleader, *Blue*, 34 S.W.3d at 554–55.

In its plea to the jurisdiction, the PUA argued that the Hatchetts do not have standing because they: (1) are not "owners" of the Property by virtue of their 2013 agreement to sell the Property to Masonwood in phases and (2) "have not sought utility service and have not been denied utility service pursuant to the impervious-cover restrictions of which they complain." To determine whether the trial court properly dismissed the Hatchetts' petition on the basis of standing, we consider whether the Hatchetts alleged facts affirmatively demonstrating their standing to bring each of their claims. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018).

The Hatchetts alleged the following facts relevant to standing: (1) their 2013 contract with Masonwood set forth a "takedown schedule" for Masonwood to "purchas[e] and develop[] the Property in phases"; (2) Masonwood "has obtained title to a portion of the Property"; (3) the Hatchetts still own the Remainder Property; and (4) the second SER "was submitted by [John] Hatchett to the []PUA for 1,137 LUEs (the balance of the water demands required for development of the Remainder Property)."

The general rule is that an owner or part owner of the property at issue, among other parties, has standing to sue for Chapter 245 vested-rights protection. *See Rogers Shavano Ranch*, 383 S.W.3d at 245. It follows, therefore, that the Hatchetts—still owning a portion of the Property, as alleged in their petition and which we must take as true in the absence of conclusive controverting evidence—have standing with respect to their Chapter 245 claim. *See id.*

Notwithstanding this general rule, however, the PUA asserts that by virtue of the Hatchetts' 2013 contract to sell the entire Property to Masonwood, albeit in phases, the Hatchetts lack standing because of the doctrines of "equitable title" and "equitable conversion by contract." *See Pine Forest Invs. Grp., LLC v. County of Bastrop*, No. 03-16-00789-CV, 2018 WL 3077972, at *7–8 (Tex. App.—Austin June 22, 2018, pet. denied) (mem. op.) (describing equitable-title doctrine as operating to allow purchaser under executory contract or "contract for deed" to compel legal title when performance of certain conditions specified in contract have occurred); *Parson v. Wolfe*, 676 S.W.2d 689, 691 (Tex. App.—Amarillo 1984, no writ) (describing equitable-conversion doctrine as "change in the nature of property by which, for certain purposes, realty is considered as personalty or personalty is considered as realty, and the property is transmissible as so considered"). However, because the dispute here is not between the Hatchetts and Masonwood, and there is no allegation of an executory contract or contract for deed, neither doctrine is applicable, and the PUA has cited no authority (nor have we found any) using either doctrine to defeat a legal-title holder's standing to bring an action concerning the property against a third party. Accordingly, to the extent that the trial court's ruling granting the PUA's plea to the jurisdiction was based on the Hatchetts' lack of standing to bring their Chapter 245 claim, it was in error.[4]

We next consider whether the Hatchetts have standing to bring their UDJA claims. The PUA contends that there is no real controversy between the parties that will be actually determined by the declaration the Hatchetts seek—that the PUA's policies, rules, and

---

[4] Because we have determined that the Hatchetts have standing to bring their Chapter 245 claim by virtue of their ownership of the Remainder Property, we need not consider the PUA's argument that the Hatchetts do not have standing because they neither sought nor were denied utility service.

7

regulations limiting density and impervious coverage on the Property are void—because the PUA has unfettered discretion to contract with, or refuse to contract with, the Hatchetts to provide them water service. *See* Tex. Loc. Gov't Code § 572.060 ("A public utility agency may . . . under terms the agency's board of directors considers appropriate, contract with private entities for services[.]"). The PUA cites evidence in the record purporting to show that the Property lies outside of the "CCN"[5] area that it "is required by law" to serve and that it therefore has absolute discretion whether to serve the Property, the exercise of which discretion cannot form the basis of a justiciable controversy. *See* Tex. Water Code § 13.250(a) ("Except as provided by this section or Section 13.2501 of this code, any retail public utility that possesses or is required to possess a certificate of public convenience and necessity shall serve every consumer within its certified area and shall render continuous and adequate service within the area or areas.").

In their pleadings, the Hatchetts allege that the Property is "located within the []PUA's designated retail water service territory as established under the []PUA's adopted Tariff" and "within the []PUA's designated Impact Fee Service Territory for water service." The PUA cites evidence attached to its plea in the form of minutes from a meeting of its Board in which an individual[6] "addressed the Board" and "pointed out that [the] Hatchett Tract is outside of the CCN and the PUA has no requirements to serve [it]." Whether the Property is, in fact, located outside of the CCN cannot be conclusively established on this record on the basis of the evidence the PUA cites. *See Miranda*, 133 S.W.3d at 227 (explaining that plea to jurisdiction

---

[5] As used by the parties and in this opinion, "CCN" stands for a "certificate of public convenience and necessity." *See* Tex. Water Code § 13.250(a).

[6] The individual is identified in other portions of the clerk's record as a member of the public and area resident.

should only be granted if pleadings and jurisdictional evidence affirmatively and conclusively negate existence of jurisdiction).

However, even if the Property is not in the CCN, while the Board has wide discretion to execute service contracts with private entities—and to do so "under terms [its] board of directors considers appropriate," *see* Tex. Loc. Gov't Code § 572.060(2)—the scope of the exercise of its discretion is limited to only, as relevant here, "the conservation, storage, transportation, treatment, or distribution of water," *see id.* § 572.058(a); *see also* Tex. Att'y Gen. Op. No. KP-0178 (2018) (opining that PUA's discretion to determine contractual conditions upon which it will provide service is limited by section 572.058 and concluding that whether PUA may require private entities to comply with impervious-coverage requirements as contractual condition to receive service "necessarily requires a fact and evidence-based query"). Furthermore, Chapter 245 expressly directs the PUA to consider the "approval, disapproval, or conditional approval" of the Hatchetts' permit application (i.e., SER) "*solely* on the basis of" the regulations, rules, and "other properly adopted requirements" in effect when Masonwood submitted its SER. *See* Tex. Loc. Gov't Code § 245.002 (emphasis added). Because the Hatchetts have alleged that the PUA—in promulgating its density and impervious-coverage limitations and subjecting the Property to those restrictions as a condition of water service—has acted beyond the scope of its authority, we conclude that they have a justiciable controversy about whether the Board may condition permit approval accordingly. In other words, whether the Board may consider factors that it is allegedly unauthorized to consider in determining whether to provide service to the Hatchetts constitutes a justiciable controversy over which the trial court had jurisdiction. Construing the Hatchetts' pleadings in their favor, we conclude that they have standing to bring their UDJA claims.

9

*Whether the PUA's immunity is waived under LGC Chapter 245*

The PUA next argued in its plea to the jurisdiction that it was entitled to dismissal of the Hatchetts' Chapter 245 claim because of an applicable exception to the general waiver of governmental immunity provided in the chapter. *See id.* § 245.006(b) ("A political subdivision's immunity from suit is waived in regard to an action under this chapter."); *see also id.* (a) ("This chapter may be enforced only through mandamus or declaratory or injunctive relief."). The PUA contends that this case fits within the "utility connections" exception to the chapter's express waiver of immunity, *see id.* § 245.004(8) ("This chapter does not apply to . . . regulations for utility connections."), because the Remainder Property is "not currently on . . . an existing pipeline" and would require extension of the PUA's infrastructure. In other words, "to obtain water or wastewater service from the []PUA, the Property must be connected to the existing []PUA infrastructure via a utility connection," and the extension of the PUA's infrastructure constitutes a "utility connection."

No court has construed this exception, and neither the chapter nor the LGC defines the term "utility connections." We, therefore, give the term its common, ordinary meaning unless the statute clearly indicates a different result. *See Texas State Bd. of Exam'rs of Marriage & Family Therapists v. Texas Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017). To determine a term's common, ordinary meaning, we typically look first to its dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities. *Id.* at 35. Also, we presume that every word in a statute has a purpose and should be given effect if reasonable and possible. *Texas Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000).

The relevant dictionary meaning of the word "utility" is "a service provided by a public utility." *Webster's Third New International Dictionary* 2525 (2002). In the context of

public utilities, such as the PUA here, "service" is defined as "conservation, transportation, treatment, or distribution of water." Tex. Loc. Gov't Code § 572.061(a). Thus, the word "utility" as used here means "the conservation, transportation, treatment, or distribution of water by a public utility." The relevant dictionary meaning of the word "connection" is "something that connects," i.e., a "coupling [or] link." *Webster's Third New International Dictionary* 481 (2002).

Based on these definitions, we conclude that the term "connection" as used in section 245.004(8) must mean something more than the "transportation of . . . water" because water transport is already contemplated in the meaning of the term "utility." Thus, the PUA's argument that the term "utility connection" means the physical extension of its pipes or other infrastructure to transport water to the Property—when transportation of water is primarily what a public utility agency does—is both a stretch and would render the word "connection" essentially superfluous. Rather, the more common-sense construction of the term "utility connection" is the one advanced by the Hatchetts: the *how* or *means by which* a particular lot, structure, or customer gets physically connected to the pipes or other infrastructure that transport water to that end point—for instance, the coupling, link, or other device physically connecting the customer to the water main.

This construction aligns with Texas caselaw employing the term "utility connections" in other contexts to refer to the means by which an individual structure is tied into existing utility infrastructure. *See Suleiman v. Texas Dep't of Pub. Transp.*, No. 01-09-00099-CV, 2010 WL 2431076, at *7 (Tex. App.—Houston [1st Dist.] June 17, 2010, no pet.) (mem. op.); *En Seguido*, 227 S.W.3d at 240, 244; *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 206 (Tex. App.—Austin 2005, pet. denied); *Hart v. City of Dallas*, 565 S.W.2d 373, 375–76 (Tex.

11

App.—Tyler 1978, no writ); *City of Houston v. Lakewood Estates, Inc.*, 381 S.W.2d 697, 698–99 (Tex. App.—Houston 1964, no writ).

Moreover, the definition of a "permit" in the LGC belies the PUA's urged construction of the term "utility connection" because the term "permit" *already contemplates and encompasses* "agreements . . . for the provision of water service." *See* Tex. Loc. Gov't Code § 245.001(1). We have already determined that the "provision of water service" as relevant here primarily involves the transportation of water. Thus, the provision excepting "regulations for utility connections" from Chapter 245's grant of vested-rights protections must mean something more narrow than the provision of water service (i.e., transportation of water) because otherwise the exception would swallow the rule.

The PUA responds to this conundrum by asserting that the definition of "permit" in the chapter applies only to an agreement to provide "standard" water service—that which does not require the extension of its infrastructure—rather than "non-standard" water service—which is what the Hatchetts requested in their SER and would require the addition of pipes and other infrastructure. However, *any* person seeking a permit (i.e., an agreement to provide water service) from the PUA would need somehow to be physically connected to the PUA's system to receive that service. If the PUA's construction of the terms "permit" and "regulations for utility connections" prevailed, then no person would ever be entitled to vested rights because the very act of "connecting" to the PUA's system would trigger the exception, rendering the existence of vested rights illusory in the context of permits for water service from a public utility.

We reject the PUA's contention that the Hatchetts are challenging "regulations for utility connections" and that the exception in LGC section 245.004(8) therefore applies. *See id.* § 245.004(8). Rather, the PUA's immunity is explicitly waived under the general waiver in

12

Chapter 245. *See id.* § 245.006(b). To the extent that the trial court dismissed the Hatchetts' vested-rights claim by determining that the PUA enjoys governmental immunity from this suit, it erred.

### *Waiver of the PUA's immunity under the UDJA*

The PUA contends that, even if the trial court had jurisdiction over the Hatchetts' Chapter 245 claim, it did not have jurisdiction over the UDJA claims because they are "bare statutory construction claims" for which the UDJA does not waive governmental immunity. *See McLane Co. v. Texas Alcoholic Beverage Comm'n*, 514 S.W.3d 871, 876 (Tex. App.—Austin 2017, pet. denied). The PUA further contends that the UDJA will not support a challenge to mere regulations or policies but is limited to challenges to statutes and regulations directly promulgated thereunder. *See Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 76–77 (Tex. 2015). In response, the Hatchetts cite cases from two of our sister courts that have permitted UDJA suits to proceed against State subdivisions where the plaintiffs did not challenge any statutes but only policies of the subdivision. *See Ackers v. City of Lubbock*, 253 S.W.3d 770, 775–76 (Tex. App.—Amarillo 2007, pet. denied) (determining that plaintiff's UDJA challenge to constitutionality of city police department's policy concerning taking photographs of minors was not barred by governmental immunity); *see also City of Crowley v. Ray*, No. 02-09-00290-CV, 2010 WL 1006278, at *5–7 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.) (determining that plaintiff's UDJA suit against city to determine his rights under federal flood-plain maps was not barred by governmental immunity despite fact that plaintiff was not challenging any statute or ordinance).

13

However, the UDJA waives sovereign immunity only in particular cases. *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (per curiam); *see Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 633–35 (Tex. 2010) (noting that UDJA waives immunity for suits challenging statutes that allege constitutional invalidation and invalidation arising from statutory interpretation). Furthermore, this Court has recently held that, regardless of how it is pleaded, when the nature of a claim is that an agency has acted without statutory or other authority, such claim is a "quintessential ultra vires claim" and must be brought against the individual state actors in their official capacities. *EMCF Partners, LLC v. Travis County*, No. 03-15-00820-CV, 2017 WL 672457, at *6 (Tex. App.—Austin Feb. 15, 2017, no pet.) (mem. op.) (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009)). This is so even if the court's analysis of whether the complained-of acts were in fact unauthorized requires some statutory construction, which mere fact "does not transform the claim from an ultra vires claim into a type of challenge to a statute's validity for which the supreme court has found a waiver of immunity." *Id.*

Here, the Hatchetts have alleged that by creating "policies, rules, and regulations limiting density and impervious coverage on the Property" the PUA has exceeded the authority granted to it by Chapter 572 of the LGC and Article XVI, section 59 of the Texas Constitution. This is in the same category as the "quintessential ultra vires claim" at issue in *EMCF Partners*, wherein the plaintiff alleged that the county commissioners court acted "without statutory or other authority" in promulgating amplified-sound restrictions as a requirement to obtain a permit to hold a music festival. *See id.* at *6. We conclude that the facts alleged and claims asserted here are ultra vires as were those at issue in *EMCF Partners* and, therefore, follow our precedent to similarly conclude that the UDJA does not waive the PUA's immunity. *See id.* Accordingly,

14

the trial court properly granted the PUA's plea to the jurisdiction as to the Hatchetts' UDJA claims.[7]

## CONCLUSION

We affirm the trial court's dismissal of the Hatchetts' UDJA claims. We reverse the trial court's dismissal of the Hatchetts' Chapter 245 vested-rights claim and remand that cause for further proceedings consistent with this opinion.

_____

Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed in Part; Reversed and Remanded in Part

Filed: March 11, 2020

---

[7] The trial court's order dismissed the Hatchetts' third amended petition without prejudice and granted them an opportunity to file an amended petition to re-plead a viable ultra vires claim within thirty days. The Hatchetts filed a fourth amended petition within that thirty-day period alleging, for the first time, ultra vires claims against certain individual employees of the PUA in their official capacities. Accordingly, our affirmance of the trial court's order dismissing the Hatchetts' third amended petition does not preclude the Hatchetts from prosecuting their new ultra vires claims.